THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRENT JACOB AND CARI JACOB, h/w      :
                                     :
          Plaintiffs,                :
     v.                              :     3:20-cv-00087
                                     :     (JUDGE MARIANI)
READING, BLUE MOUNTAIN, AND          :
NORTHERN RAILROAD COMPANY, and       :
INTERNATIONAL PAPER COMPANY,         :
                                     :
          Defendants.                :

## MEMORANDUM OPINION

### I. INTRODUCTION

Before the Court is Defendant's Motion for Summary Judgment (Doc. 53). Defendant International Paper Company ("Defendant" or "IP") seeks summary judgment on Plaintiffs Brent and Cari Jacob's claims in Counts II and III of their Complaint relating to a railroad incident that occurred at a facility owned by Defendant (Compl., Doc 1).[1] For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment (Doc. 53).

### II. STATEMENT OF UNDISPUTED MATERIAL FACTS

This action arises out of a dispute over Defendant's alleged negligence in failing to protect Plaintiff Brent Jacob from dangerous conditions that resulted in an incident at one of

---

[1] Reading, Blue Mountain, and Northern Railroad Company is the Defendant in Count I of Plaintiff's Complaint and it has not moved for Summary Judgment.

Defendant's facilities that left Jacob severely injured. Defendant has submitted a "Statement of Undisputed Material Facts" ("SOF") (Doc. 54) as to which it submits that there is no genuine issue or dispute. Plaintiffs have responded by offering a "Response in Opposition to the Statement of Material Facts" ("RSOF") (Doc. 57) as to which they contend that there remain multiple disputed issues of material facts.

## I.      Background Information on IP

IP is a company, headquartered in Memphis, Tennessee, which is in the business of producing paper and paper products. (SOF ¶ 1; RSOF ¶ 1.) IP is not and has never been in the railroad industry and has never been considered a common carrier. (SOF ¶ 2; RSOF ¶ 2.) Defendant, Reading, Blue Mountain and Northern Railroad Company ("RBMN"), is a short-line railroad, which services, inter alia, companies across the middle and northeast Pennsylvania. (SOF ¶ 3; RSOF ¶ 3.) Plaintiffs, Brent Jacob ("Jacob") and Cari Jacob ("Mrs. Jacob") are adult individuals, husband and wife, who resided at 298 Woodlawn Avenue, Mountain Top, Pennsylvania 18707. (SOF ¶ 4; RSOF ¶ 4.)[2]

## II.     Information on the IP Facility

IP is the record owner of the property located at 2164 Locust Gap Hwy, Mount Carmel, Pennsylvania 17851 (the "IP Facility") and has been since April 1, 1992. (SOF ¶ 5;

---

[2] Plaintiffs note that they recently moved to 27 North Main Street, Mountain Top, Pennsylvania. (*See* RSOF ¶ 4.)

RSOF ¶ 5.)  At all relevant times, the IP Facility is a manufacturing plant used to manufacture paper and paper products. (SOF ¶ 6; RSOF ¶ 6.)

The photographs found in Defendant's Exhibit C (Doc. 53-1 at 327-328) are an accurate representation of the IP Facility on June 20, 2018. (SOF ¶ 7; RSOF ¶ 7.) On the eastern most side of the IP Facility is a large room called the roll room (the "Roll Room"). (SOF ¶ 8; RSOF ¶ 8.) The Roll Room includes a loading dock area with a single set of railroad tracks along the eastern side of the room. (SOF ¶ 9; RSOF ¶ 9.) The railroad tracks are at ground level, with the loading dock being elevated approximately 3.8 feet above the railroad tracks. (SOF ¶ 10; RSOF ¶ 10.)

The railroad track area inside the IP Facility is called the "Pit." (*Id*.) A large door, similar to a garage door, opens and closes to allow trains and railcars to enter the IP Facility as needed (the "Garage Door"). (SOF ¶ 11; RSOF ¶ 11.) A derail, which is used as a safety precaution to prevent harm from any runaway railcars, is approximately 68 feet south along the rail tracks of the Garage Door and opening to the Pit. (SOF ¶ 12; RSOF ¶ 12.) Just to the left/west of the Garage Door is an exterior set of steps leading to a door, which enters into the loading dock area (the "Man Door"). (SOF ¶ 13; RSOF ¶ 13.) A button controlling the opening and closing of the Garage Door is located just inside the Man Door. (SOF ¶ 14; RSOF ¶ 14.)

Just to the left/west of the Garage Door and just to the right/east of the Man Door on the exterior of the building is a yellow and black sign approximately 14 inches wide and 10

inches high stating "CAUTION CLOSE CLEARANCE." (SOF ¶ 15; RSOF ¶ 15.) The center

of the "CAUTION CLOSE CLEARANCE" sign is approximately 80 inches (6.67 feet) above

ground level. (SOF ¶ 16; RSOF ¶ 16.) Walking down the railroad tracks into the Pit or

utilizing the Man Door, both of which require a railroad worker to pass the "CAUTION

CLOSE CLEARANCE" sign, are the only two ways for a railroad worker to access the dock

area. (SOF ¶ 17; RSOF ¶ 17.)

There is also just to the left/west of the Man Door is a yellow and black sign approximately 24

inches high and 18 inches wide, which states "MANDATORY PPE High Vis Vest Required."

(SOF ¶ 18; RSOF ¶ 18.) Railcars are shoved into the Pit area by a locomotive engine so

that materials may be off-loaded from the railcars to the Roll Room, to be used in the

manufacturing of paper products. (SOF ¶ 19; RSOF ¶ 19.) The distance between the

railroad tracks in the Pit and the loading dock platform has been unchanged since at least

1992. (SOF ¶ 20; RSOF ¶ 20.)

There is also a yellow warning strip that runs along the edge of the loading dock

adjacent to the Pit. (SOF ¶ 21; RSOF ¶ 21.) The current distance between the railroad

tracks and the platform was to facilitate the unloading of materials from railcars for the

manufacture of the paper products at the IP Facility.[3] (SOF ¶ 22; RSOF ¶ 22.) The above is

an accurate description of the IP Facility as it existed on June 20, 2018 up and through the

---

[3] Plaintiffs dispute that the distance between the railroad tracks and the platform was "necessary." (*See* RSOF ¶ 22.)

present. (SOF ¶ 23; RSOF ¶ 23.) No material changes were made to the relevant areas of the IP Facility between the date of the incident, June 20, 2018, and the present date. (SOF ¶ 24; RSOF ¶ 24.)

### III.    Jacob Incident

Jacob began his employment with RBMN on February 16, 2011 as a conductor. (SOF ¶ 25; RSOF ¶ 25.) Beginning in 2018, along with his role as a conductor, Jacob was also trained and began working as an engineer. (SOF ¶ 26; RSOF ¶ 26.) Prior to the incident, Jacob had been to the IP Facility as an engineer two or three times. (SOF ¶ 27; RSOF ¶ 27.) On the evening of June 19, 2018, Jacob received an email from Joe Matuella ("Matuella"), the conductor and engineer scheduling coordinator for RBMN, indicating that he was to report to the Tamaqua, Pennsylvania location the next day and was assigned the role of conductor for the QAMC line, with Chad Frederickson ("Frederickson") assigned as engineer. (SOF ¶ 28; RSOF ¶ 28.)

The QAMC line began at the Tamaqua location, and included Blaschak Coal, Universal Forest Products, the IP Facility and Saint Nichs Breaker. (SOF ¶ 29; RSOF ¶ 29.) Upon receipt of the email regarding his assignment, Jacob contacted Matuella on the evening of June 19, 2018 and explained to him that he was not qualified to serve as a conductor on the QAMC line. (SOF ¶ 30; RSOF ¶ 30.) At that time, Matuella indicated he would be changing Jacob's assignment to engineer for the QAMC line for the following day.

(*Id.*) Jacob arrived at the Tamaqua, Pennsylvania location on June 20, 2018 at approximately 5:00 a.m. (SOF ¶ 31; RSOF ¶ 31.) At that time, Jacob learned that he was assigned the role of qualifying conductor for the QAMC line, not engineer. (SOF ¶ 32; RSOF ¶ 32.) Rather, Frederickson was assigned to be the engineer for the job and Caleb Fetterolf ("Fetterolf") was assigned to be the conductor for the job, additionally serving as the instructor qualifying Jacob as a conductor on the QAMC line, including the IP Facility. (*Id.*) With Fetterolf qualifying Jacob as a conductor for the QAMC line, Jacob had no concerns about participating in the day's assignment. (SOF ¶ 33; RSOF ¶ 33.)

Fetterolf, Frederickson, and Jacob (the "Line Crew") departed on the train from Tamaqua between approximately 5:00 a.m. and 6:00 a.m. and headed towards Blaschak Coal. (SOF ¶ 34; RSOF ¶ 34.) Once at Blaschak Coal, the Line Crew delivered several cars. (SOF ¶ 35; RSOF ¶ 35.) While at Blaschak Coal, Jacob participated in the delivery of the cars and got off the train to stand next to Fetterolf. (*Id.*) The Line Crew then returned back to the train and traveled to Universal Forest Products and dropped off a car at that location. (SOF ¶ 36; RSOF ¶ 36.)

The Line Crew and train then continued towards the IP Facility. (*Id.*) During this time, Jacob kept his personal cell phone in his back right pocket of his pants. (SOF ¶ 37; RSOF ¶ 37.) Jacob called Mrs. Jacob at approximately 9:50 a.m. to 10:00 a.m. to check on her as she had walking pneumonia at the time. (SOF ¶ 38; RSOF ¶ 38.) The Line Crew arrived at the IP Facility at approximately 10:00 a.m. (SOF ¶ 39; RSOF ¶ 39.) The Line Crew and train

stopped at the runaround for the IP Facility. (SOF ¶ 40; RSOF ¶ 40.) At that point, Jacob

and Fetterolf got off the train engine. Jacob indicated to Fetterolf and Frederickson that he

was going to walk-up to the derail, open the derail and then open the Garage Door for the

tracks to the IP Facility. (*Id.*)

Jacob was aware of the existence of the derail at the IP Facility due to his previous

experience as an engineer on the QAMC job. (SOF ¶ 41; RSOF ¶ 41.) On this day, June

20, 2018, the train consisted of approximately six (6) boxcars as well as the locomotive

engine. (SOF ¶ 42; RSOF ¶ 42.) The runaround allows the train operator to move the

engine from the front of the train to the rear in order to shove the train cars into the Pit of

the IP Facility. (SOF ¶ 43; RSOF ¶ 43.) The runaround is approximately thirty (30) boxcars (or

approximately 1,500 feet) from the IP Facility. (SOF ¶ 44; RSOF ¶ 44.) The derail is a

device used to derail and stop any railcars that rolled-away. (SOF ¶ 45; RSOF ¶ 45.) Jacob

began walking to the derail. (SOF ¶ 46; RSOF ¶ 46.) As he was walking towards the derail,

Jacob was looking at the ground due to the debris, concrete blocks and uneven surface he

was walking over. (*Id.*) Once he approached the derail, Jacob stood facing the derail, flipped

the derail off and told Fetterolf that the derail was off. (SOF ¶ 47; RSOF ¶ 47.) Jacob

observed that the Garage Door of the IP Facility was open already. (SOF ¶ 48; RSOF ¶ 48.)

Jacob radioed to Fetterolf and Frederickson to begin moving the train as the derail had been

removed. (SOF ¶ 49; RSOF ¶ 49.)

At this point, the train began approaching Jacob while he was at the derail. (SOF ¶ 50; RSOF ¶ 50.) As a result, Jacob began walking backwards towards the IP Facility and into the Pit, facing the train the entire time, looking at the movement coming towards the IP Facility. (*Id*.) Once he was inside the IP Facility in the Pit, Jacob observed a set of wheel chocks on the west side of the Pit. He stopped approximately twenty (20) feet inside the Pit at the wheel chocks with the intent of putting the chocks under the railcars and tying the brakes on. (SOF ¶ 51; RSOF ¶ 51.) Jacob's intention was to stand between the dock and the moving train while inside the Pit, let the moving train pass him and then place the chocks under the wheel of the car closest to the Garage Door entrance. (SOF ¶ 52; RSOF ¶ 52.)

As Jacob watched the train approach him, he radioed to Fetterolf asking how many handbrakes he should apply; however, Fetterolf never answered. (SOF ¶ 53; RSOF ¶ 53.) At all relevant times, Jacob was aware that the train was approaching him as he was walking backwards into the building and stood twenty (20) feet inside the building with a moving train headed towards him. (SOF ¶ 54; RSOF ¶ 54.) While Jacob was in the Pit, he also observed an IP worker operating a forklift on the dock. (SOF ¶ 55; RSOF ¶ 55.) As a result, he was watching the IP employee and the train as it approached him. (*Id*.)

When Jacob was approximately twenty (20) feet inside the building next to the wheel chocks, and as the train was approaching Jacob, once it came through the door, Jacob realized that there was a lever protruding from the railcar and that it was going to pinch him.

(SOF ¶ 56; RSOF ¶ 56.) As a result, Jacob tried to push himself up on the dock to try and avoid the protruding boxcar handle. (*Id*.) However, Jacob was unsuccessful at avoiding the boxcar handle. (*Id*.) The handle pinched Jacob and spun Jacob for approximately 30 feet along the side of the dock. (*Id*.)

Jacob's goal in pushing himself up on the dock was to attempt to exit the Pit area. (SOF ¶ 57; RSOF ¶ 57.) No one ever told Jacob to stand on the west side of the Pit between the dock and the train. (SOF ¶ 58; RSOF ¶ 58.) The train eventually stopped when the IP forklift operator saw Jacob pinched between the dock and railcar and shouted at Fetterolf for the train to stop. (SOF ¶ 59; RSOF ¶ 59.) Fetterolf then alerted Frederickson via radio to stop the train, who then did stop the train. (*Id*.) Once the train stopped, Jacob fell to the ground between the dock and the train track. (SOF ¶ 60; RSOF ¶ 60.) At that point, the police were notified of the incident and an ambulance was called. (SOF ¶ 61; RSOF ¶ 61.)

Jacob was eventually transported via ambulance to Geisinger Medical Center in Danville, Pennsylvania, where he was diagnosed with a broken pelvis, broken tailbone and fracture in his back transverse processor. (SOF ¶ 62; RSOF ¶ 62.) Jacob was at Geisinger Medical Center for six (6) days and then at John Heinz Rehabilitation Center for three (3) days. (SOF ¶ 63; RSOF ¶ 63.) Jacob eventually returned to work with RBMN on January 7, 2019 without any medical restrictions. (SOF ¶ 64; RSOF ¶ 64.)

On the date of the incident, Jacob was approximately 6 feet, 6 inches tall and approximately 350 lbs. (SOF ¶ 65; RSOF ¶ 65.) Counsel for Plaintiffs concurs in the

dismissal of the negligence *per se* claim, asserted pursuant to 52 Pa. Code §§ 33.122 through 33.127 of the Pennsylvania Public Utility Commission regulations, against IP asserted in Count II. (SOF ¶ 68; RSOF ¶ 68.) A copy of the letter requesting concurrence pursuant to Local Rule 7.1 dated October 20, 2021 from Gretchen L. Petersen, Esq., counsel for IP, as well as the letter of concurrence dated October 21, 2021 from Michael J. Olley, Esq., counsel for Plaintiffs, are filed as Defendant's Exhibit D (Doc. 53-1 at 329-330).

## III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then

the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974

F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d

659 (1993).

      However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

In its Motion for Summary Judgment (Doc. 53), Defendant seeks summary judgment on all of Plaintiffs' claims against it that are contained within the Complaint (Doc. 1). First, Defendant seeks summary judgment on Count II of Plaintiffs' Complaint that alleges that Defendant was negligent in failing to warn about the dangers that resulted in Plaintiff Brent Jacob's injury. (*See* Doc. 53 at 1-2.) Second, Defendant seeks summary judgment on Count III of Plaintiffs' Complaint that alleges loss of consortium on the part of Plaintiff Cari Jacob. (*Id.*) The Court will address each of these alleged bases for summary judgment in turn.

## A. Count II: Plaintiff Brent Jacob's Negligence Claim

Defendant first contends that summary judgment is warranted on Count II of Plaintiffs' Complaint. (*See* Doc. 53-3 at 11.) Defendant argues that summary judgment is appropriate because (1) Defendant is "not a 'Common Carrier' as defined by the [Public

Utility Commission] and therefore, cannot be *per se* negligent for any alleged violation of 52

Pa. Code §§ 33.122 through §§ 33.127 pertaining to close clearances under the PUC

regulations" (*Id*.); and (2) Defendant "has exercised the proper level of care to a business

invitee and has not breached any duty of care to Jacob" (*Id*. at 12). The Court will address

each of these arguments in favor of summary judgment in turn.

### 1. Whether Defendant is a "Common Carrier" and thus *Per Se* Negligent

Defendant first argues that summary judgment is warranted with respect to Count II

of Plaintiffs' Complaint because Defendant is not a common carrier as defined by the Public

Utilities Code ("PUC") and thus cannot be *per se* negligent for any of Plaintiffs' alleged

violations. (*Id*. at 11.)

Plaintiffs consent to the dismissal of Count II as it pertains specifically to the *per se*

negligence claim for any violations of 52 Pa. Code §§ 33.122 through §§ 33.127. (*See* Doc.

53-1 at 330.) Therefore, the Court will address only whether Defendant has pointed to facts

in the record showing there is no genuine dispute of material fact as to whether Defendant

was generally negligent.

### 2. Defendant's Alleged General Negligence

Defendant argues that summary judgment is warranted with respect to Count II of

Plaintiffs' Complaint because Defendant "has exercised the proper level of care to a

business invitee and has not breached any duty of care to Jacob, therefore, Jacob cannot

state a cause of action for general negligence against IP." (Doc. 55 at 12.) Defendant further

contends that dismissal is warranted because Defendant "exercised reasonable care when warning Jacob, a business invitee, of the close clearance." (*Id.*) For their part, Plaintiffs contend that there are multiple issues of material fact as to which summary judgment should be denied. (*See* Doc. 56 at 20-23.)

"A business invitee is a person who is invited to enter or remain on the land of another for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Walker v. Drexel Univ.*, 971 A.2d 521, 524 n.1 (Pa. Super. 2009) (quoting *Emge v. Hagosky*, 712 A.2d 315 (Pa. Super. 1998)). The parties do not dispute that Jacob was a business invitee for the purpose of Plaintiffs' negligence claim. (*See, e.g.,* Docs 55 at 13 and 56 at 19.)

The Third Circuit has set out the relevant standard for a business invitee to make out a negligence claim under Pennsylvania law:

> To recover in a tort claim, the plaintiff must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached its duty; (3) a causal connection exists between the defendant's conduct and the plaintiff's injury; and (4) the plaintiff suffered actual loss or damage. *See Farabaugh v. Pa. Tpk. Comm'n,* 590 Pa. 46, 911 A.2d 1264, 1272–73 (2006). [...] A business owes its invitees "the duty of maintaining the premises in a reasonably safe condition ... for the purposes for which the invitation to customers [is] extended." *Regelski v. F.W. Woolworth Co. of Pa.,* 423 Pa. 524, 225 A.2d 561, 562 (1967).

> Under Pennsylvania law, a business breaches it['s] [sic] duty to an invitee if the business:

> > "(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee, and

14

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

*Carrender v. Fitterer,* 503 Pa. 178, 469 A.2d 120, 123 (1983) (quoting Restatement (Second) of Torts § 343 (1965)).

*Larkin v. Super Fresh Food Markets, Inc.,* 291 F. App'x 483, 484 (3d Cir. 2008).

"[T]he particular duty owed to a business invitee must be determined on a case-by-case basis." *Campisi v. Acme Markets, Inc.,* 915 A.2d 117, 119 (Pa. Super. 2006) (citation omitted). "Neither the mere existence of a harmful condition [...] nor the mere happening of an accident due to such a condition evidences a breach of the proprietor's duty of care or raises a presumption of negligence." *Id.* at 120 (citations omitted). "Restatement Section 343A provides that no liability exists when the dangerous condition is known or obvious to the invitee unless the proprietor should anticipate the harm despite such knowledge." *Id.* (citing Restatement (Second) of Torts § 343A(1) (1965)).

Because Defendant concedes that it "was aware of the close clearance between the dock and the rails" and describes the close clearance as a "dangerous condition" (Doc. 55 at 15), the Court deems that element of finding a breach of duty admitted and will therefore only address whether there is a dispute of fact with respect to elements (b) and (c).

The second element of finding a breach of duty is whether Defendant "should expect that [Plaintiffs] will not discover or realize the danger, or will fail to protect themselves

against it." *Carrender,* 469 A.2d 120, 123 (quoting Restatement (Second) of Torts § 343 (1965)).

Defendant contends that summary judgment is warranted because "[a]lthough IP was aware of the close clearance between the dock and the rails, the dangerous condition was also obvious to Jacob." (Doc. 55 at 15.) To support this contention, Defendant asserts that it "posted a large, yellow 'CAUTION CLOSE CLEARANCE' sign on the exterior of the building closest to the close clearance condition of the pit" and that it "added a yellow warning strip along the edge of the dock to aid an individual in recognizing the dangers presented by the close clearance." (*Id.*)

> Restatement Section 343A provides that no liability exists when the dangerous condition is known or obvious to the invitee unless the proprietor should anticipate the harm despite such knowledge. Restatement (Second) of Torts § 343A(1) (1965). Comment (e) states:
>
>> If [the invitee] knows the actual conditions, and the activities carried on, and the dangers involved in either, he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the land. The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care, or that he will voluntarily assume the risk of harm if he does not succeed in doing so. Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.
>
> Restatement (Second) of Torts § 343A cmt. e (1965).

*Campisi*, 915 A.2d at 120.

Here, as the Court explains, *infra*, Jacob points to sufficient factual evidence to create a material dispute of fact as to whether the close clearance sign or the yellow warning strip reasonably put Jacob on notice of the danger of the close clearance *inside* of the Pit. *See, e.g., Kollien v. Kmart Corp.,* 2016 WL 4379033, at *4 (M.D. Pa. Aug. 17, 2016) (finding on summary judgment that "[i]t will be up to the factfinder to determine whether such a warning [sign], if present, is sufficient to warn customers not to test the umbrella on a patio set" for the purpose of avoiding negligence liability.) Based on the same evidence offered by Plaintiffs that is discussed below, the Court finds that there is a genuine dispute of fact with respect to this element of a breach of duty.

With respect to the third element of a breach of duty owing to a business invitee, Plaintiffs point to ample evidence demonstrating a genuine dispute of material fact as to whether Defendant failed to exercise reasonable care to protect Jacob against the danger of the close clearance. Plaintiffs reference Jacob's deposition testimony to contend that "[n]o one had alerted Jacob to any close clearance hazard within the Pit and there were no signs within the Pit warning of the close clearance between the loading dock and the train." (Doc. 56 at 20.) During his deposition, Jacob testified that he never saw warnings or was otherwise warned that he could be struck by a train inside the Pit:

Q. Do you ever recall seeing this yellow bar here?

A. No, I do not.

Q. Do you ever recall seeing this caution close clearance sign?

17

A. No.

(Doc. 56-3 at 102:20-25.)

Q. All right. Prior to the car entering – the train and the leading car entering the building, had you been given any warning from anyone or was there any indication to you that you could be struck by that train?

A. No.

(Doc. 56-3 at 260:19-23.)

The Court finds that Jacob's deposition creates a genuine dispute of fact as to whether Defendant exercised reasonable care to adequately warn of or protect against the danger of the close clearance inside the Pit. Additionally, George Gavalla, Plaintiffs' liability expert, testified when questioned by IP's counsel that the sign outside of the Pit did not adequately warn of the close clearance *inside* the Pit:

Q. So, in this case, and I understand you have criticisms of the sign, but you did see the close clearance sign outside the building at the Mount Carmel facility?

A. Yes there was a – and I actually put a photograph in my report in the attachments. There is a close clearance sign outside the building and next to the doorway where the clearance is the closest. Unfortunately, inside the building where there was a close clearance along the entire loading dock, three hundred feet – approximately, 300 feet long, there was no signage.

Q. And you said in your report that you did not consider that sign to be on the same side as the close clearance. And, I mean, when you say it wasn't on the same side, do you mean because it wasn't on the clearance itself?

A. I mean because it was outside the building. The close clearance was inside the building. So to me that's not really on the same side. It's on a different side of the building all together. So in that regard, I consider it not on the same side as the close clearance.

As I also pointed out because the loading dock was, I believe, large enough to hold six cars which would mean it was approximately three hundred feet long, I would expect there would be more than one close clearance sign because the potential hazard isn't just for railroad employees. You also have to be concerned about plant employees and potential contractors who may, for whatever reason, whether they should be there or not, may find themselves on the ground in the pit area at least to give them a warning that there is a potential close clearance – that there is a close clearance there with the rail cars.

. . . .

Q. And when you talk about putting on additional sides – signs, would you recommend that the – I am sorry, I am covering my mouth. Would you recommend that the close clearance sign outside the building be removed or that additional signage is necessary?

A. I would, if you are asking me should it be removed, there is a close clearance with the doorway. So no, I believe it's appropriate to have a close clearance sign right by the doorway where this one existed.

But I believe there should be additional close clearance signs along the loading dock informing, you know, training crews and anyone else that is in the plant, plant employees, customers, contractors who may find themselves there that there is a close clearance with the loading dock and equipment on the tracks.

. . . .

Q. And again, even if you disagree with the sufficiency of the close clearance sign outside the building, would you agree that having that sign there is a step towards addressing the close clearance?

A. I believe it doesn't address the close clearance inside the building. I believe it addresses the close clearance at the doorway where it's located. But I really didn't see that as addressing the close clearance inside of the building.

. . . .

Q. So you are saying that the big yellow sign that said close clearance which was outside the building only pertained to the doorway. Is that your testimony?

. . . .

[A.] As I testified earlier, if I was walking there for the first time, and not having this background knowledge of what happened here, and I saw that sign, it would tell me that there is a close clearance at that doorway and indeed that was the closest point.

(Doc. 56-8 at 75:20-77:4, 78:4-20, 79:15-23; 142:21-143:7.)

This testimony from Gavalla, paired with Jacob's testimony that he was unaware of any warnings related to a close clearance inside of the Pit, creates an issue of material fact as to whether Defendant exercised reasonable care in warning of or protecting against the close clearance inside of the building by placing its sign on the exterior of the building adjacent to the Garage. *See, e.g., Kollien,* 2016 WL 4379033, at *4.

Plaintiffs additionally reference Gavalla's expert report as evidence that the sign outside the Pit warned of the close clearance at the Garage entrance, not inside the Pit itself. Gavalla stated that:

[a] sign reading "Caution – Close Clearance" was mounted on the outside wall of the plant between the stairway and the overhead doorway. During a post-accident investigation, the distance between the doorway and the side of the railcar was measured to be 13 inches. While the distance between the loading dock and the side of the railcar was measured to be 16 inches. (IP000008 & IP000016) These measurements were similar to measurements during a site inspection conducted on May 4, 2021, involving a similar (but not identical) railcar. The protruding handle of the boxcar door was measured to be 7 inches from the edge of the overhead doorway.

(Doc. 56-9 at 7.)

Gavalla's testimony and report create a genuine issue of fact as to whether the sign outside of the Pit adequately warned of the close clearance inside of the Pit, or if the sign only warned of close clearance at the Garage to which the sign was directly adjacent. (*See, e.g.*, Docs. 56-15 and 56-16.)[4]

Additionally, a reasonable jury could find that the photographs in question do not contradict Gavalla's testimony that the sign warned of one close clearance area at the Garage entrance of the Pit but did not warn of the close clearance area within the Pit itself. (Doc. 56-8 at 75:20-77:4, 78:4-20, 79:15-23.) Likewise, a reasonable jury could find that the photographic evidence supports Plaintiffs' contention and Gavalla's testimony that the Garage entrance to the Pit protrudes closer to the railroad tracks than the edge of the loading dock within the interior of the Pit. (*See* Doc. 56-15 at 2.) Therefore, this evidence supports the finding of a material dispute of fact as to whether the Defendant exercised reasonable care in warning of or protecting Jacob from the dangers of the close clearance inside the Pit through the placement of the sign on the exterior of the building adjacent to the Garage entrance. *See Kollien,* 2016 WL 4379033, at *4.

---

[4] Defendant argues in its reply brief that "the Court must disregard [Mr. Gavalla's testimony] as 1) Mr. Gavalla is not a qualified expert to testify regarding general premises liability, and 2) photographs unequivocally contradict Mr. Gavalla's opinion and show there is only one close clearance area." (Doc. 59 at 3.) "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue ... will not suffice to bring that issue before this court.'" *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir.) (citation omitted) (ellipsis in original)), *cert. denied,* 513 U.S. 946 (1994). Plaintiffs have not had an opportunity to respond to Defendant's contention that Gavalla is unqualified as an expert. Thus, the Court will not consider this argument at the summary judgment stage.

Defendant also contends that summary judgment is warranted because a yellow strip running along the interior edge of the loading dock should have given Jacob sufficient notice of the close clearance. (*See* Doc. 55 at 15-16.) Plaintiffs point to the deposition testimony of Joseph Valania, Defendant's Manager of Safety, to argue that the yellow strip only warned individuals of the edge of the loading dock so that no one would fall off the loading dock and into the Pit:

> Q. All right. And then also looking at that photograph, there's a yellow painted area at the top of the loading dock. Is that posted there as a warning to keep people operating equipment on the loading dock from getting too close to the edge of the loading dock?
>
> A. It is.

(Doc. 56-7 at 26:24-27:6.)[5]

Additionally, Plaintiffs reference the testimony of Liz Jones, a lift truck operator for Defendant, who testified that the yellow strip was there to warn individuals of the edge of the loading dock:

> Q. Okay. Now, in this photograph, page 3 of IP-1, you see it looks like the – the edge of the dock there's a yellow – there's something painted yellow. Do you see that?
>
> A. Yes.

---

[5] Defendant argues that "Plaintiffs omit the portion of Joseph Valania's testimony that explains the large 'CAUTION CLOSE CLEARANCE' sign warns both railroad employees riding on the side of a train as well as pedestrians of the close clearance and 'pinch point there'" (Doc. 59 at 2.) Valania's testimony referenced by Defendant may be presented to the jury at trial as fact witness testimony or as expert witness testimony if Valania is admitted as an expert under Federal Rule of Evidence 701-703. (*See* Doc. 56-7 at 69:5-18.)

Q. Is that to – is that there to warn you and other people in the loading dock not to get too close to the edge?

A. Yes.

(Doc. 56-6 at 59:7-15.)[6]

Because there is a genuine dispute of fact as to what the purpose was of the yellow strip running along the interior edge of the loading dock, the Court finds that there is also a genuine dispute of fact as to whether Defendant failed to exercise reasonable care in warning Jacob of the close clearance inside the Pit.

Plaintiffs offer ample evidence to create a material dispute of fact as to whether Defendant "exercise[d] reasonable care to protect [Jacob] against the danger." *Carrender,* 503 Pa. 178, 469 A.2d at 123 (1983). Therefore, summary judgment will accordingly be denied.

## B. Count III: Plaintiff Cari Jacob's Loss of Consortium Claim

Defendant argues that because Cari Jacob's loss of consortium claim is a derivative action, it must be dismissed in the event the Court grants summary judgment with respect to Count II of Plaintiffs' Complaint. (*See* Doc. 53-3 at 17-18.) Because the Court will deny in

---

[6] Defendant contends that "Ms. Jones was never asked whether the sign could also warn railroad pedestrians like Jacob and her testimony did not indicate the close clearance sign only warned railcar riders and not pedestrians." (Doc. 59 at 2.) Jones' testimony stating that the yellow strip was present to warn people of the edge and risk of falling into the Pit nonetheless contributes to a finding that a genuine dispute of material fact exists as to what the purpose of the yellow strip was, and by extension whether Jacob was adequately warned of the danger of the close clearance inside of the Pit. (*See* Doc. 56-6 at 59:7-15.) These are matters for presentation to a jury.

part summary judgment with respect to Count II of Plaintiffs' Complaint, it is likewise

appropriate to deny summary judgment on Count III of the Complaint as well.

## V.  CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc.

53) will be granted in part and denied in part. An appropriate Order follows.


_____
Robert D. Mariani
United States District Judge